I saw on the record you were sometimes referred to as Mr. Kassab and sometimes as Mr. Alaric Lorenzo. Which do you prefer? Mr. Kassab, Your Honor. Mr. Kassab. All right. Mr. Kassab, you may proceed when you're ready. May it please the court, Alaric Lorenzo Kassab for the appellant Larry Jones. Your Honor, in August of 2024, when this case first went to trial, in a unanimous jury verdict, we won. I would ask the court at its convenience- Help me to understand exactly what went wrong with the jury instructions because I found it somewhat confusing. Did the court just simply fail to provide instructions on damages in both in writing and orally? Is that what happened? Yes, Your Honor. Well, the court did provide instructions on damages, I think, in writing, but it did not give a full instruction as to whether or not they could consider past pain and suffering, future pain and suffering. What I'm trying to understand is, was there an instruction that should have been used that just was not either given to the jury in writing or said orally or was there a situation in which they got it in writing but it wasn't said orally or vice? I found it to be unclear. I believe that if there was any instructions on damages, it would have been only in writing, but the verdict- So did the jury actually get instructions on damages in writing and the physical copy they had? Your Honor, that I cannot say for sure, but what I know is that the only- I recall that in the verdict form, the judge just asked that the feeling- Did the judge's oral instructions even include the elements of the claims of the cause of  Okay. His oral instructions did not, but the written instructions did and- And everyone sat there and the judge gives this horrifically incomplete set of instructions and everyone just sat there and no one said anything? No one stood up and said, Your Honor, you've missed the main instructions in the case. As you would see if you look at your convenience at the excerpts of record 9ER244, I constantly would try to stand and tell the judge that, hey, Your Honor, we need you to do this and do that and he would tell me to sit down. He acknowledges in 9ER244 that this happened so many times and he would say, I told you to sit down, but you figured out a way to tell me things. Including specifically as to the punitive damages piece of this? Punitive damages, when we started trial, we did not know that they were even bifurcated. Then before the case is submitted, the judge makes us understand that they will not determine punitive damages now. So as soon as the verdict was announced, I'm expecting the judge- First of all, we still had the Moneo claim that was pending and we had the punitive damages issue, so I'm expecting him to go ahead and ask them to go back and consider punitive damages. He reads the verdict and dismisses them. But at that point, why were you not jumping out of your chair saying, don't let the jurors out of this courtroom? Judge Wilson is no, Your Honor. You would look at 9ER244 and see, he would constantly tell you to sit down. So as soon as the jury was leaving, I stood up. Because after he dismissed them, he started talking, I said, Your Honor, we have punitive damages. The jury had just retired into the deliberation room. The clerk of court went in there and he just went in and came out and said, we're on the 10th floor. If they wanted them back, they could have gotten them back. They had not even left. It wasn't even two minutes since they had been dismissed. So that was what happened. Anyways, Your Honor, we won the first trial. My closing arguments to the jury, docket number 187, the transcripts were already ready after we had filed. What happened with the transcript? Did you try and get an expedited transcript of the first trial so that you would have the record to be able to cross people on your testimony?  As you can even see, my closing arguments were only ready after this appeal was filed. My understanding is that the court reporter was fired. I had to be calling her personally, tracking her house, trying to get her number to call her and beg her to do what she had to do. Is any of this in the record? The part about you trying to track these things down by going to her house and by her being fired, is that anywhere in the record? No, but as you would see, because each time that this transcript, I mean, when we place the orders, we would file it. Did you ask the court to delay the trial until the transcript could be prepared? When the court ordered a new trial, the court said, the court gave us seven days, I think a week to appear for the second trial. Given my experience with Judge Wilson, and I think if counsel who was trial counsel for the defendants in the first trial, if she was here, I think that she would agree that this is one of the most difficult courtrooms you can ever be in. Judge Wilson's court is known as the rocket docket. It's not easy being there. He tells you to sit down, even when you stand to tell him that, hey, there's a mistake, there's this, he tells you to sit down. It's a war room. You really can't do anything. Judge Wilson is above 80. God bless him. So the second trial was held a week after the first one? No, a month after the first one, but a week after the court granted a motion for reconsideration. On 9-11, 2024, nothing good comes out of 9-11, your honors. And that was the day when the judge decided, after agreeing that we're going to have a trial only on damages, because what happened was, after the verdict was read, I told him about the punitive damages. They said the jury had left. He said we would return on Monday, because it was a Friday, for the consummation. But the jury hadn't determined eligibility for punitive damages. And that issue was just inextricably intertwined with the underlying issues. And so how do you, I think that was what the court was troubled by. How do you sever those? It isn't just calculating the extent of the injury. Yes, your honor. And so, like you have seen in the briefs, Marocan, Marocan, the case of Marocan, which is what they cited when they filed their motion for reconsideration, your honor. The question that we must ask ourselves is that, what is the harm that Marocan and gasoline products and United Airlines aim to cure? The harm is that, when punitive damages are sought, the degree of culpability of the defendant has to be established. In this case, an Eighth Amendment violation case, where we argued maliciousness, we argued purposefulness. It is in docket number 187, pages 13 and 16, the jury found in our favor. Which means that we have already established the degree of culpability of the defendant, of the deputy. There is no reason then to come back and say, it is intertwined, and we cannot have a second separate trial on punitive damages. It has been done. This circuit has reversed cases, and as that punitive damages alone be considered, it is not Greek mythology. Yes, I understand the concern for Marocan, but Marocan is factually distinguishable. Marocan was a Fourth Amendment excessive force case. In the Fourth Amendment excessive force cases, your honor, the facts have to, you look at it from an objective point of view. Subjective intent does not come to play. In an excessive force case, based on the Eighth Amendment, you look at subjectiveness, you look at seriousness, sadistic behavior. In this case, I am asking that this court distinguish Marocan from all cases that have to do with the Eighth Amendment. Because the Eighth Amendment encapsulates the elements required for punitive damages. We had already established that the actions of the- Do you think, even though it wasn't framed as eligibility for punitive damages, the jury's finding essentially established that punitive damages were eligible, and that therefore it was just damages and amount of punitive damages. Yes, your honor. Because, again, like I said, we argued, even if the judge did not put it in his oral instructions, defendants did not object to that, it was in the written instructions. In my closing arguments, I went through the elements, pages 13 and 16 of Doctrine 187, which is my closing argument. I argued maliciousness, intentionality, purposefulness, and the jury found, in our favor, the jury watched the video three times. They requested to watch the video three times, the first jury. Now, in the second trial, what happened? My star witness, which is one of the inmates, Mr. Turner, who watched everything happen as it unfolded, he heard everything, he had testified during the first trial. Counsel, I do want to hear a little bit about Turner, but I'm trying to figure out what you wanted that second trial to look like. What would it have looked like if you had allowed, if you had had a trial that was only limited to punitives? Would you still have to put all the witnesses on so that they understood what happened? Did you have to get Mr. Turner there so he tells what Deputy Inigo said? No. The second trial was just meant for the jury to determine the amount of punitive damages, if any. But how would it be a new jury, right? It wouldn't be the old jury. Correct. Okay, but if you have a new jury, how do they get the context for punitive damages? Even if a judge comes in and says, damages have already been set in a prior trial, so I need you to decide the punitives. How do you decide the punitives if you don't put all the witnesses on and they don't get to view the video? No, Your Honor, of course we would have had to show them the video, that this is the incident that happened and the first jury has found that this was done maliciously. Do you put Jones on? I would have called you. Put Gay on? No, I don't need Gay anymore, Your Honor, because we've already established liability. Now we are just going in for the amount and the jury in its discretion could have said, well, yes, it was malicious, but we're not going to punish you. It could be a dollar. It could be two dollars. Then we also had the damages issue because- I think Judge Ribey's point is that even if maliciousness is established for purposes of eligibility for punitives, in assessing the reprehensibility of the conduct, you need some texture to understanding the circumstances of the action and whether or not the behavior of the officer really warrants that, and so you're basically going to re-put on a lot of the same case. Well, Your Honor, then in that case, then no case would ever go on a second trial only on punitive damages because that has happened in the circuit. Many cases have gone for a second trial only on punitives. Of course you have to give them some context, but we're seeing that, Your Honor, the Seventh Amendment says that when a verdict has been reached pursuant to a trial that was done constitutionally, it should not be disturbed. This verdict was reached pursuant to proper arguments that we made and the evidence, and in fact, Your Honor, I would call the Court's attention to Scott v. Harris. The Supreme Court of the United States said that if the version of facts provided by one party differ from the record, from the video- What do you think that the officer said that is blatantly contradicted by the video in Scott v. Harris' sense? Almost everything, Your Honor. First of all, he said he had to kick that door because the door is heavy. Three times that door was opened and closed without any issues. When he took the plaintiff out of the shower to his cell, he closed that door without kicking it. He closed the tracelot because he was angry. They called him because my client had fallen in the shower. He was mad at him. He closed the tracelot. When they asked him during the first trial, why did he close the tracelot, he said, my client said he told him that you're not going to use the phone because you're acting like an asshole. So he closed the tracelot so my client could not send his hand to take the tracelot. He also lied that he was scared of Mr. Gay, but you can see in the video, he opened the door and turned his back. Mr. Gay was right there, the cell was open. So many lies, Your Honor. If you look at the video, there was no reason to kick that door. Yeah, okay. Deputy Inigo testifies that he saw blood, but I'm trying to figure out where he saw the blood. What blood did he see? He said he saw his bloody hand, but he saw his bloody hand where? The food access slot was closed. Was there a window? Did he see the hand in the window? There was a window, but I also think that what he meant was that when he kicked the door shut, because he kicked the shut on the finger, so it's right there and the blood is gushing out. You know what I'm saying? So I'm sure that is what he meant. But when I looked at the video, I don't remember seeing blood running down the post of the doorframe. Your Honor, it's not going to be blood like gushing out of some nerve or something. This is blood from the finger, probably a stain on the door. But he testified that he saw it. I know he did. I just couldn't figure out where he saw it. I'm pretty sure it was when the incident happened. And then Your Honor, if I can briefly talk- You were going to mention about Turner. Can you go back to that?  Turner stated that the deputy told him that this is, because Turner told him, you're going to get in trouble for what you did. But you tried to get Turner for the second trial. The prison, they wouldn't let, they told me they would not produce him. They told me if they did, they would put it only on, only the phone on. That was what they did during the first trial. They didn't want to turn on the video. I had to tell, and the court dismissed the witness and said, Your Honor, no, they are playing a game. They can turn on the video. They turned it on the first time. They were able to testify. They knew by the time we got to the second trial, everything that Turner said. I called the prison. I submitted the order for them to produce Turner. They told me they would categorically not produce him. And if they did, it would be by phone only. When they brought him- Did you accept, I mean, you still had your objection. Why didn't you accept the phone only? Oh, no. Well, with Gay, with Turner, they said that, but then they ended up not doing it. Not even doing that. Yes. But with Gay, they brought him in, and then they turned on the phone. They wouldn't turn on the video. The judge dismissed him again. I said, Your Honor, this is what they did during the first trial. I called the prison after the break and told them that somebody was doing something that's stopping, preventing this man from testifying. I need them to turn on the video. There was someone I spoke to. He said, don't worry. I'm going to work on this. And then they brought him back, and I told the judge, then they turned on the video. That was how Gay was able to testify. Your Honor, the second trial permitted them to close all the holes that we had punched in their story. They went in and changed everything. I thought so, Your Honor, the excessive force claim is hardly, people hardly win that claim. If we won it, and these people, the defendants had a second chance, they made sure that they left no stone unturned. That first verdict should not be disturbed, Your Honor. You've almost used your time, but we've asked you a lot of questions, so I'm going to give you three minutes for rebuttal, but I think we should hear from the other side at this point.  All right. So, we will hear next from Mr. Stepanian. Good morning, Your Honors. May it please the Court. I am Karin Stepanian, and I represent the Apple East. There are a few things that I would like to address. Can we begin by clarifying? I want to make sure we're on the same page, understanding what happened with the jury instructions, and what exactly the error was. I frankly had a hard time figuring this out, in part because in the critical pages of your brief, you cite pages that don't exist in the excerpts. You have 3 ER 264, which there's no such page number in Volume 3. It's in Volume 2, and it doesn't correspond to the page, so I kind of got a bit lost in trying to follow your brief. You might, if I'm right that those are wrong, you should file a corrected brief that corrects the record cites so that they don't send us down rabbit holes. I apologize, Judge Collins, for that, and I actually did review last night, and I realized that there was a discrepancy in terms of record citations, and I do have correct record cites right here that I'm able to provide to the Court. I think the discussion that police planned to cite was the following the dismissal of the jury on Monday, August 19th, where the district court indicated that the instruction concerning the punitive damages might have been given to the jury in writing, and so were the compensatory damages, but the district court . . . The district court gave the punitive damage instructions in writing, but they were never said orally. They were never said . . . What about the elements of the cause of action? Were those said orally? I don't think the elements of the causes of action were said orally either. Were they given in writing to the jury? I believe they were given in writing to the jury. Everyone just sat there. I mean, this is the . . . looking at the oral trend, this is the worst set of jury instructions I've ever seen, and no one stood up and said, Your Honor, you've missed half of it. You don't give the oral instruction with the elements of the cause of action? Your Honor, correct. There were no directing the district court's attention to that. However, counsel for appellants did argue that the standard for the finding of excessive force was malicious and sadistic, and the jury nevertheless returned the verdict for appellant. So on the punitive damages written instructions, are you saying that those were provided to the jury? I thought the judge had in mind bifurcating. Your Honor, I'm not sure if I can answer that question correctly. The point is the mistake, the alleged mistake in the first trial that was the jury never left after the verdict was rendered for minister, for appellant to decide issue of punitive damages. They were discharged. So now whether the instructions were given or not, the jury still had to be called back and let known that they are to decide the issue of punitive damages. And the district court tried to get the jury back. Now I don't know whether one minute, two minute was sufficient for the jury to exit the courthouse on Friday afternoon, but the jury, deputy clerk came back, said to the district court that the jury was gone. So now the question was how the district court was supposed to remedy that issue. Ordering a new trial, full new trial was the correct remedy. And we do not argue that the rule 59A1A allows a trial of fewer than all issues. However, that rule is subject to seventh amendment constraints and the United States Supreme Court in gasoline products indicated that where the issues are, the issue to be tried, if the issue to be tried is distinct and separable, so trying it separately can be done without injustice, then it should be tried. But where the issues of exemplary punitive damages and liability is so intertwined that trying them separately would cause confusion and uncertainty, then the retrial should be had on all issues. And that's what district court ordered. So if there are any issues with the first trial, the second trial remedied those by, the district court ordering the second trial remedied those mistakes. So why, why wasn't Turner present at the second trial when he had been, um, they, they, you know, issued the right subpoena or gone through the right process to try and get him there? Why wasn't he there? Your Honor, we don't, our police don't know why the Turner wasn't able to, uh, there was some logistical issues. Appellants counsel was going back and forth, uh, out of the courtroom and back on the phone with the prison system. But neither the county, uh, uh, system nor the district court had anything to do with whatever issues were with Mr. Turner. But even if Turner did not, I mean, can we just, we're just supposed to look the other way. I mean, that benefits the county that, that county employees are not complying with the court process to get this witness's testimony that's been demanded for a civil trial. Uh, Judge Collins. I don't believe that, uh, Mr. Turner was in a county custody. I think he was in a state prison and I don't believe, uh, there's nothing in the record that the county. He was in state, not in county custody. We don't have anything, nothing in the record to indicate that the county had custody of Mr. Turner. But even if Mr. Turner's testimony as appellants, uh, uh, uh, appellant argues we're not admit presented that testimony consisted of, uh, of one, a statement that happened after the incident. We don't know. And it's not trivial, particularly to punitive. It is not trivial, but it's vague, uh, Judge Collins. We don't know what's meant. I've done worse things. Was I late? So that's, that's for the jury to figure out. And if Mr. Inigo wishes to come back, the county wants to put Mr. Inigo back on there and explain his statement, you're free to do so. But this is a pretty explosive statement. And appellant's counsel asked that question of Mr. Inigo. He asked Deputy Inigo, have you told that you said, uh, have you told to Mr. Turner that you've done the worst things in the county? And he denied making the statement. He denied making the statement. It's hard to see how that helps though. I mean, there was another witness who would say otherwise. Well, that is why the, uh, if, if, if appellant counsel wanted to, uh, impeach Deputy Inigo, that's where the transcript should have been produced and, uh, uh, appellant could properly lay a foundation. I mean, are they to be faulted for the court reporter's lack of diligence that, you know, the court basically was not going to allow any cross on, on the prior testimony from the first trial, um, absent the transcript. They had no ability to get the transcript. The reporter didn't produce it. And so this entire line of inquiry, everything that was said at the first trial is off limits. Uh, Your Honor, again, the record is, there's nothing in the record to, uh, uh, reflect, uh, counsel, appellant counsel's efforts to expedite a transcript. Uh, so we don't know really what was transpired and what communication was between appellant counsel and the court reporter. And to address a counsel's earlier point that they were given seven days to have a trial, uh, I believe the district court asked the parties within seven days, meet and confer and come with a date that will both work for them. And I believe counsel indicated to the trial counsel for the appellees that he had planned vacation. Uh, so he wanted to have it, I believe, earlier. Is that in the record, any of this? Uh, that's, that's, I don't believe that's in the record, but, but that's, uh, if, if that's incorrect. Why did the district court, um, exclude things from the second trial that were permitted in the first trial? Um, Your Honor, I, first of all, the exclusion was very, probability value of that evidence was very minimal and the risk of prejudice was much higher. Well, the two pieces of evidence that- Did the district, did the district court say that? Yes, the district court- And so was it reversing itself? Was the finding that it had made an obvious error in the first, in the first trial? Your Honor, those, uh, decisions reviewed for abuse of discretion and then the court, district court does not abuse- Well, but an abuse of discretion can, can be for violating, uh, principles or principles of law. And one of the principles is that generally, uh, evidentiary decisions made in a first trial, that evidence is still, will still be admitted in a second trial unless there has been a change in the, in the law or some other obvious error. I understand that, uh, Judge Biby, and I believe Appellant's Counsel cites Docket 89. I don't think that's in the record, but, uh, Appellant's Counsel cites Docket 89 to show that those two pieces of evidence were admitted. However, looking at that docket, uh, the, uh, marks concerning those two exhibits, uh, are at the, uh, column that says identified. I, there is no mark that those exhibits were, uh, admitted and were presented to the jury. What was the nature of the pretrial discovery here? Were there depositions taken of any of these witnesses? I may not have sufficient information to respond to that, Judge Brez, but, uh, I know for a fact that there was no deposition of, uh, Deputy Yannigo taken, and I am unclear whether there are any other depositions were, uh, uh, taken. Would you, would you turn to the, uh, judge's judgment, um, the summary judgment ruling, um, on the deliberate indifference? Yes, Your Honor. It's a high standard. It's more than negligence. It's more than gross negligence. Appellant had to show that there was actual awareness of serious risk, conscious disregard of that risk. Uh, Deputy Yannigo provided definite- How is it not a conscious disregard? I mean, he knew that he was injured right away because he goes and gets medical attention, but he walks pretty leisurely down that hallway in what was really an emergency situation. Why isn't that on its face, deliberate indifference? Your Honor, he, Deputy Yannigo only learned of injury after, uh, uh, uh, appellant, uh, smacked his finger at the, the, over the window of the cell door. At that point, he only realized that that was the point of the injury. And when- He is, he is screaming, and, and Gay is testifying that he is screaming, uh, you, you took off my finger. My finger's trapped in the door. And Yannigo says he saw the blood. I don't know where he saw the blood because I didn't see the blood on the video. Uh, and he doesn't even turn his head. Um, and he, he just deals with Gay and then he walks off. Five minutes later, he comes, he comes back with medical assistance and we've got a fingertip stuck in the door. Your Honor, he, as soon as he, uh, shut the door, he perhaps saw the blood. He secured the inmate Gay who was loose in, in the hallway. Right after securing him, he walked toward the, now, whether it was, whether he should have run to the, uh, to the dispatcher's booth and then telephoned for help, that's, that's not an inquiry. Why isn't that a jury question as to whether it's deliberate indifference to saunter off in the direction of, you know, medical help? He doesn't have his radio with him. Uh, he doesn't have very far to go cause this is not a very big area, but it's five minutes before it, before he comes back. Your Honor, the, uh, damage was already done to, uh, appellant. How does he know that? He's not a doctor. He didn't turn around and look. He didn't try to reopen the door in case, in case the whole hand was now was, was simply stuck and we had broken fingers as opposed to a, a, a fingertip that's been severed. He hasn't made any inquiry at all. And that's. Not to mention the indifference to the agony during the time period. And, and, and what's, and that's what Deputy Inigo, uh, explained that he was not trained in providing medical. Why are we supposed to take his explanations? Why isn't that a jury question? The district court said that no reasonable jury could find that he had been indifferent. And as I look at that, uh, video, uh, it certainly seems to me that a jury could decide that he had been indifferent. In addressing serious medical need to, uh, to the, to, to appellant and, uh, the record shows and declaration of Deputy Inigo states that he was, uh, the, whatever the extent of the injury was, he didn't feel like he would, he could provide the, um, he could provide the, uh, necessary medical help. So he went and. He might've opened the door. Within. But that, but that's, again, reasonable minds here would have to, it, it, it, it is not a clear one way street to show that, that open by opening the door, uh, pellants, uh, injury would have been, uh, no, but he has, but you don't know that. And I don't know that. And I don't think that Inigo knows that. And I'm not sure anybody else knows that, but the circumstances of the events that were unfolding had to be taken into account before, uh, before we could decide whether a reasonable jury could pretermitted a trial on this issue. That's, that's the whole problem. I mean, you know, knowing that someone has been injured, that the, the door is closed on the hand and then walking away leisurely and, and leaving him in that condition for five minutes, why isn't that a jury question on deliberate indifference? I mean, I understand your arguments. You can make these arguments to a jury, but I, I don't see why this was withheld from the jury. And Your Honor, again, we will, uh, uh, our position is that given the circumstances that, uh, Deputy Inigo was not prepared to render first aid help to, um, to appellant and the, uh, escalated, uh, ten, ten, uh, tension that escalated, uh, prior to that, just considering all those circumstances, uh, the, uh, the one solution that was, uh, appropriate for Deputy Inigo to do is just to go and, and then, uh, bring medical assistance, which actually arrived within a, uh, less than two minutes. What does the record say about how long Mr. Jones's finger was caught in the door? It was caught from the door, and the video is probably the best evidence from the time the door was shut until the medical, uh, assistance. How long was it actually stuck in the door, the finger? Does the record show that? The record would show from the moment the door closes and, uh, the moment the door opens when medical assistance and other deputies were present. It was caught in there the whole time, right? It was caught there in, the whole time. The hand was stuck in the door the entire time?  Not the, not the hand, but the fingertip was stuck there. No, but I'm talking the fingertip attached to the hand. At what point, how long was the fingertip in the door before he pulled it out? Does the record show? I think it's, I think, Your Honor, it's immediately because the Deputy Inigo, Deputy Inigo testified that that's how he saw blood, uh, Jones smacking his, uh, uh, uh, severed, uh, finger over the window. So at that point, while Deputy Inigo was still there, the finger, uh, the tip of the finger was already severed. And so the time from the, from when the, from when the hand is, is smashed in the doors, is slammed in the door until the finger is removed is five minutes. No, no, Your Honor, it's probably a matter of seconds. No, no, until the, until, until the door is reopened and the finger is removed is five minutes, right? That's the district court's finding. That's the, that's what. In the summary judgment. He says, he says that it took Inigo approximately five minutes to return with medical assistance.  So that's the timeframe when the, uh, the door was open and the tip of the finger was there. However, the severance of the finger, uh, the tip of the finger occurred almost immediately when, uh, when the appellant, uh, smacked his, uh, uh, finger over the, uh, window. I see my time is, oh, I still have a few, a few minutes. No, you're, you're actually over, but I'll, I'll let you wrap up. Yes, we just, most of the, most of the decisions, uh, that was made by the district court are reviewed for abuse of discretion and there's sufficient of evidence for the, uh, uh, jury findings in the, in the second trial. So we would, uh, at least respectfully request the, uh, uh, this court affirmed the judgment in full. All right. Thank you, counsel. We'll hear rebuttal.  Can you address Judge Bress's question? What is the record, um, evidence on the summary judgment record show or in the, in the trial record on when he removed his hand and basically acquiesced in the severing of the, of the tip of the, of the finger? Your Honor, I know that he removed his hand maybe within like two minutes of the deputy walking away because I think at that point they were trying to have the deputy come back and we opened the door. He did not, which would have stopped the plaintiff from trying to yank his hand off because he was in a serious pain. I understood counsel was saying like he did it immediately. You don't think that that's correct? No, your Honor, again, you know, counsel was counsel for the second trial. The counsel was there for the first trial. It's not here. That's why counsel sometimes. Okay. But, uh, so I'm still trying to figure out the chronology here. So if, if he, he slams the, he slams the finger in the door, how does Inigo see blood? Your Honor, that was his testimony. I believe that it was when he slammed the finger because by slamming it, there must have been a little bit of blood that might have oozed out. But again, I don't, I don't remember seeing any blood on the, on the post in the, in the video. Counsel for the, for the county suggests that he, that he really pulls the finger quickly that severs it and that he is, that he's slamming, that he's pounding on the window and that that's how Inigo sees the blood is, is on the window when he's, when he's evidently pounding his, his hand on the window. That is possible, Your Honor. Well, that would be then almost immediately. That that is possible. I mean, there's just a lot of uncertainty about that question. Yes. And that's why I believe that a deliberate indifference claim should never have been resolved on summary judgment because like we stated in our briefs, the case of Heflin v. Stewart is a Sixth Circuit case where deputies arrived at an inmate cell and found him hanging and did not pull him down. And the court found that that was being, that they were deliberately indifferent by not bringing him down. An inmate would have committed suicide. Even though they thought he was already dead, the court said they should have at least attempted to bring him down. Deputy Inigo walks away after slamming the door on plaintiff's finger. I mean, even children know that if you're playing with your brother in your dad's car and you slam the door, you have to reopen it. He did not do that. Your Honor. Let me just ask you on this. Is the deliberate indifference not reopening the door immediately or soon, or is a deliberate indifference the the more casual way in which he walked away or both? All of them walking away, not reopening the door, not returning in his transcript. He did not return with the other people. He did not even return to bother and see, oh, how did this happen? Let's put aside how long the finger was actually stuck in the door intact, attached to the hand, because that is, I don't know the answer to that and how long it was in there. But the walking away. If he had expressed great surprise and exclamation, Inigo, and said, oh, my goodness, you know, I can see you're in pain. I will rush, you know, I will walk faster to get you medical attention. How would this be any different? I mean, because what would have happened would have been the same. We believe that he should have reopened the door because that is what I understand that. But I'm but I'm asking about the walking away and his demeanor. I mean, I think that that was too casual for someone that was facing such an emergence. But what difference would it have made? I mean, if he had exclaimed and said, oh, my goodness, I will get you help and then had walked slightly faster away. What would have really changed here? That shows that that would have shown that he was not being deliberately indifferent. I would have expected him to run, actually, not walk, you know. But he did go and summon medical attention and it arrived within several minutes. Yes, your honor. But in certain emergencies, even in real life, when every second counts, the police are only minutes away. Minutes could be. How far did he have to go to go and get help? The testimony was what, 20 to 30 feet? No, he was not very clear about that because I asked him, who did you call? Down the hall. I think I think the testimony from Gay was that there were only seven cells on this on this hallway. Yes. And I thought the testimony from a couple of them, including including Inigo, was that he was 20 to 30 feet from his station where he left his radio and that and that having the radio wouldn't have accelerated anything here. I believe that was his testimony, your honor. But I think that five, we know where the medical help had to come from. It had to come from the nurses, from the I think they have a medical center somewhere. OK, but someplace else. Yes, somewhere, somewhere else. Um, your honor's over your time, but I'll give you 30 seconds to wrap up. OK, your honor's. I just want to say that we had the first verdict was for the plaintiff. The sheriff's department, when they conducted the investigation, they granted the grievance. They rarely do so. Granting a grievance. And you said that that the docket entry shows that that was actually only identified in the first trial, not admitted. Is that wrong? It was admitted. Those were admitted. It's just that in the judges in the lower court, there was a lot of like just things thrown around because the judge sometimes was a little bit difficult. But like I said, if you look at the docket that I cited, the I think nine ER two four four. It was only that the grievance was only excluded in the second trial. Yes, the grievance and the judge and the judge's claim. The explanation was he said not relevant. Well, it doesn't it. There's no specificity to it. So it's too prejudicial. Nothing. The grievance and the results of the grievance, which would have shown that the judge granted. Now, the result of the grievance, I thought, said something about internal investigation authorized. Do you know whether there was further investigation as a result of that? No, it said it said investigation was commenced and then administrative action was taken. And then on the left side, I think it says that the deputy's action, he did not follow their guidelines or something like that to that effect. So the judge said, well, this is sort of vague. Was there was there other record evidence that could have been brought forward on what this all meant? No, he didn't say was vague. He just said, why are you bringing it in? It's not relevant. But what I was wondering about is when on the portion of the form that says approved disposition and there's a bunch of preprinted boxes and the one that's checked says internal affairs investigation initiated. So that's the disposition which suggests there'll be a further internal affairs investigation after this grievance resolution. Do you know whether that happened and was anything about that introduced? Yes. In an exhibit to the complaint that was filed, we actually have the result where it says it was granted for the exhibit to the complaint that is on. I don't have to talk the citation, your honor, but it's there in our in our excerpts. The complaint itself, there is an exhibit to it which actually has the granting of the grievance. It narrates the facts and then it grants it. OK. All right, unless further questions. All right. Thank you, counsel. The case just argued will be submitted and this court for this session today stands adjourned. All right. All persons having had business before this court, this humble United States Court of Appeals for the Ninth Circuit will now depart for this court to be session and adjourned.
judges: BYBEE, COLLINS, BRESS